**Clarence TUCKER, Jr. and Jean Tucker, Appellants,**

v.

**PAXSON MACHINE COMPANY, Appellee,**

**William Thropp & Sons Company, Division of J.M.L. Trading Corporation.**

No. 80–1381.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1981.

Decided April 8, 1981.

Rehearing and Rehearing En Banc Denied May 12, 1981.

Chopin & Kennedy, P. C., by Elizabeth C. Kennedy, St. Louis, Mo., for appellants-plaintiffs Clarence Tucker, Jr., et al.

Gray & Ritter, Charles E. Gray, Kevin M. Cushing, St. Louis, Mo., for appellee-defendant.

Before BRIGHT, STEPHENSON, and McMILLIAN, Circuit Judges.

BRIGHT, Circuit Judge.

Clarence and Jean Tucker (Tucker) brought this products liability action against the Paxson Machine Company (Paxson), an alleged corporate successor of William R. Thropp & Sons Company (Thropp), to recover damages for injuries allegedly caused by a defective rubber calendar machine manufactured by Thropp.[1] The district court[2] dismissed the action on Paxson's motion for summary judgment. *Tucker v. Paxson Machine Co.*, 489 F.Supp. 391 (E.D.Mo.1980). Tucker now appeals from the adverse judgment, contending that the traditional rule regarding liability of successor corporations should not shield Paxson from liability for injuries caused by a defective product manufactured by its predecessor, Thropp. Appellant claims the trial court erred

    1) in refusing to adopt the "product line" theory of strict liability;

    2) in finding that Paxson is not a continuation of its predecessor; and

    3) in refusing to find that Paxson had an independent duty to warn Tucker's employer of the potentially dangerous condition of the Thropp machine.

We reject these contentions and, therefore, affirm the district court's judgment.

## I. *Background.*

William R. Thropp & Sons Company was established in 1888 to design and manufacture milling equipment for the rubber industry. In 1952, Morey Machinery Company (Morey) purchased substantially all of Thropp's assets. Prior to its purchase of Thropp, Morey also had acquired the J. M. Lehmann Company, Inc. (Lehmann). Morey subsequently sold the plant, equipment, machines, and tools of Thropp at a public auction, but retained Thropp's name, patents, copyrights, drawings, trademarks, and specifications for use by Lehmann in the manufacturing and selling of machines.

In 1961, Lehmann ceased the business of manufacturing and transferred to Mullins Manufacturing Corporation (Mullins) its inventory, machinery, work in process, drawings, patents, trademarks, jigs, fixtures, and the right to use the Lehmann and Thropp trade names. Mullins thereafter operated a Lehmann/Thropp Division and manufactured machines under the Lehmann and Thropp trade names. Lehmann changed its name to the J.M.L. Trading Corporation (JML) and presently limits its active business to a real estate holding company in New York. On November 30, 1973, Mullins filed a petition for an arrangement in bankruptcy.

On January 7, 1974, Paxson Machine Company acquired certain assets of the Lehmann/Thropp Division from Mullins' receiver in bankruptcy. The assets transferred to Paxson included the trade name, copyrights, patents, license agreement, customer lists, products, drawings, jigs, fixtures, customer and stock orders, and finished parts of the Lehmann/Thropp Division. The terms of the purchase agreement provided that the receiver and Mullins

---

1. Tucker also sought damages for his injuries from J.M.L. Trading Corp. (J.M.L.), William Thropp & Sons Company, Division of J.M.L. (Thropp Division), and Mullins Manufacturing Corp. (Mullins), as alleged corporate successors of Thropp. The district court dismissed Tucker's complaint against Thropp Division, finding that it no longer existed as a corporate entity. The court also dismissed the complaints against J.M.L. for lack of personal jurisdiction and against Mullins for want of service of process.

2. The Honorable H. Kenneth Wangelin, Chief Judge, United States District Court for the Eastern District of Missouri.

"shall indemnify and hold harmless Paxson against * * * product liability claims" arising from goods manufactured by the Lehmann/Thropp Division. Under the purchase agreement, sixty-to-eighty percent of Lehmann/Thropp's employees continued their work as employees of Paxson, including manufacturing and shop workers, supervisory and office staff, engineers, and sales personnel. None of the shareholders, executives, or managing personnel of Mullins or its Lehmann/Thropp Division, however, acquired any interest in Paxson. At the time of Paxson's motion for summary judgment, Mullins was still being operated by a receiver.

After it acquired the Lehmann/Thropp Division assets, Paxson began to manufacture and sell various kinds of mills and calendars, such as "Lehmann/Thropp" ink mills, "Lehmann/Thropp" soap and chocolate mills, "Lehmann/Thropp" laboratory mills, and "Thropp 2 roll mills." Although Paxson asserts that it never has manufactured rubber calendar machines, Tucker contends that Paxson manufactures substantially the same machine as caused his injury and that Paxson relies on the good will of its predecessor, Thropp, in its advertising.[3]

In 1918, the William R. Thropp & Sons Company manufactured and sold a rubber calendar machine to the Cupples Company Manufacturers of St. Louis, Missouri (Cupples). Fifty-eight years later, on or about March 22, 1976, the moving cylinders of the 1918 machine crushed the hand of Clarence Tucker, who worked for Cupples. Tucker thereafter filed the present action in district court, alleging strict liability, negligence, and breach of warranty. The district court, in granting Paxson's motion for summary judgment, held that under Mis-

souri law[4] Paxson had not assumed the liability for defective products manufactured and sold by Thropp.

## II. Issues.

### A. The Corporate Rule of Nonliability.

Under the traditional principles of corporate law, the nature of the transaction determines whether a corporate transferee assumes the liabilities of its transferor. If the parties effect the transfer of a corporate enterprise through a merger, consolidation, or sale of stock, the transferee assumes its predecessor's liabilities, including product liability claims. If the transferee *purchases* the assets of the transferor for cash, however, the transferee generally does not assume the transferor's liabilities. This general rule,[5] and its well-recognized exceptions, have long been a part of Missouri law:

[W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape lia' ility for such debts. [*Brockman v. O'Neill*, 565 S.W.2d 796, 798 (Mo. Ct.App.1978) (citing *Ingram v. Prairie Block Coal Co.*, 319 Mo. 644, 5 S.W.2d 413, 416 (1928) and *Sweeney v. Heap O'Brien Mining Co.*, 194 Mo.App. 140, 186 S.W. 739, 741 (1916)).]

The district court cited and applied this general rule in dismissing Tucker's action against Paxson.[6]

---

3. Paxson claims in its advertising that it has been "serving the rubber and plastic industry since 1888" and "If it's Thropp it's reliable!"

4. Both parties agree that Missouri law governs this diversity action because it is the situs of the injury and the residence of Tucker.

5. For a collection of cases invoking the general rule, *see* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 n.1 (1973).

6. The district court found that the exceptions to the general rule of nonliability did not apply in this case. The court held that the imposition of liability under the "assumption of liability" exception was precluded by a clause in the Mullins/Paxson sales agreement providing that

The traditional rule of corporate nonliability developed as a response to the need to protect bonafide purchasers from unassumed liability. L. Frumer & M. Friedman, 1 *Products Liability* § 5.06 (1980). To offset the potentially harsh impact of the rule, however, the law also developed methods to protect the rights of corporate creditors after dissolution.[7] Nevertheless, these methods would not protect persons like Tucker who sustain injuries from a machine manufactured by a company that long ago had sold its assets and dissolved its business. Although the law of strict liability might provide a basis for recovery against the original manufacturer,[8] the injured person generally cannot recover damages from the purchaser of the manufacturer's assets.

### B. The Extension of Liability to Successor Corporations.[9]

Convinced that the general rule of nonliability of successor corporations should not be applied to frustrate the policies of strict liability, a number of courts have deviated from its strict application in the products liability context. Three approaches have emerged in the effort to "develop a reasonable rule for products liability cases which arise subsequent to corporation transfers[.]" *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873, 878 (1976).

Several courts have rejected the traditional rule by adopting a new "product line" theory in products liability cases. *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). *Accord, Ramirez v. Amsted Industries, Inc.*, 171 N.J.Super. 261, 408 A.2d 818 (App.Div.1979), *cert. granted*, 82 N.J. 298, 412 A.2d 804 (1980). Others have expanded the traditional merger and continuation exceptions to allow recovery against purchasers of corporate assets. *See, e. g., Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974) (expanding the merger exception) (Pennsylvania law), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974) (expanding the mere continuation exception) (New Hampshire law); *Turner v. Bituminous Casualty Co., supra* (expanding both the merger and continuation exceptions) (successor may be liable if totality of transaction demonstrates basic continuity of the enterprise). Still other courts have imposed liability on acquiring corporations for their own negligence in failing to warn of dangers in their transferor's products. *Shane v. Hobam, Inc.*, 332 F.Supp. 526 (E.D. Pa.1971).

In this diversity case, we must determine whether Missouri would depart from the traditional rule and hold Paxson liable for

the receiver "shall indemnify and hold harmless Paxson against * * * product liability claims." *Tucker v. Paxson Machine Co., supra*, 489 F.Supp. at 392. Further, the court determined that the possibility of either "merger" or "continuation" was precluded by the fact that both Paxson and its predecessor, Mullins, "continue to operate after the sale just as before." *Id.* Finally, the court found the "fraud" exception inapplicable.

7. The corporate survival statute serves as one protective device. The Missouri statute provides that suits against a dissolved corporation may be brought within two years after the dissolution. Mo.Ann.Stat. § 351.565 (Vernon 1966). For an analysis of the development of the general rule in the context of creditor protection, *see* Note, *Assumption of Products Liability in Corporate Acquisitions*, 55 B.U.L.Rev. 86, 91–95 (1975).

8. Under existing case law, liability has also been imposed on producers of raw materials, manufacturers of component parts, assemblers, packagers of the final product, wholesalers and distributors, retailers, and business entities which represent the product as their own. *See generally* L. Frumer & M. Friedman, 1 *Products Liability* § 2 (1980).

9. For views on the liability of successor corporations for defective products, *see* Juenger & Schulman, *Assets, Sales and Products Liability*, 22 Wayne L.Rev. 39 (1975); Wallach, *Products Liability: A Remedy in Search of a Defendant—The Effect of a Sale of Assets and Subsequent Dissolution on Product Dissatisfaction Claims*, 41 Mo.L.Rev. 321 (1976); Note, *Expanding the Products Liability of Successor Corporations*, 27 Hasting L.J. 1305 (1976); Note, *Post-dissolution Product Claims and the Emerging Rule of Successor Liability*, 64 Va.L. Rev. 861 (1978); and, Note, *Products Liability Corporations—Asset Sales and Successor Liability*, 44 Tenn.L.Rev. 905 (1977).

its predecessor's torts on either a product line or a continuation theory. We must also determine whether Paxson could be held liable for failure to warn Tucker's employer of the alleged defects in the Thropp machine.

### C. Product Line.

█ Tucker primarily contends that Missouri would impose liability on Paxson under the product line rule first announced in *Ray v. Alad Corp., supra.* In *Ray*, the successor corporation, Alad II, acquired the assets of Alad I one year before Ray was injured on an allegedly defective ladder manufactured by Alad I. Alad I's factory and sales personnel continued in the employ of Alad II, which manufactured the same line of ladders under the "Alad" name and solicited Alad II's customers with no outward indication of any change in the ownership of the business.[10] As phrased by the court, the question presented was "whether the policies underlying strict tort liability for defective products call for a special exception to the rule that would otherwise insulate the present defendant from plaintiff's claim." *Ray v. Alad Corp., supra,* 560 P.2d at 8. Expressly limiting its decision to the facts presented, the court tied Alad II's liability to the continued production of its predecessor's product line:

> We therefore conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here

presented assumes strict tort liability for defects in units of the same product line previously *manufactured* and distributed *by the entity from which the business was acquired.* [*Id.* at 11 (emphasis added).][11]

█ In the absence of a controlling state decision, a federal court must apply the rule it believes the highest state court would follow. *Luster v. Retail Credit Co.,* 575 F.2d 609, 613 (8th Cir. 1978). The district court reasoned that the Missouri court would not adopt the product line rule only two years after it elected to follow the general rule and its well-recognized exceptions in *Brockmann v. O'Neill,* 565 S.W.2d 796 (Mo.Ct.App.1978). *Tucker v. Paxson Machine Co., supra,* 489 F.Supp. at 393.

In *Brockmann,* the payees of a promissory note sought to recover from the corporate successor on a note executed by its corporate predecessor. The court found liability under the "mere continuation" exception to the general rule. Although the issue in *Brockmann* concerned successor liability for promissory notes rather than for injuries caused by defective products, we cannot say that the district court misinterpreted Missouri law. *See Luster v. Retail Credit Co., supra,* 575 F.2d at 614.

Tucker argues that Missouri would hold Paxson liable under the *Ray* rule because Missouri has embraced an expansive view of the doctrine of strict liability.[12] In our

**10.** The transferred assets included the physical plant, manufacturing equipment, inventory, work in progress, finished goods, trade name, good will, and Alad I's interest in the real property used for manufacturing. The general manager of Alad provided consulting services for about six months after the sale. As part of the transaction, Alad I agreed to dissolve as soon as practicable.

**11.** *But see Rawlings v. D. M. Oliver, Inc.,* 97 Cal.App.3d 890, 159 Cal.Rptr. 119 (Cal.Ct.App. 1979) (imposing liability under *Ray* although the successor did not manufacture the identical product line). In the present case, the parties dispute whether Paxson continues to manufacture the Thropp product line. On a motion for summary judgment, we must view the facts most favorable to the party opposing the motion and grant that party the benefit of all

favorable inferences warranted by the record. *McLain v. Meier,* 612 F.2d 349, 356 (8th Cir. 1979). Thus, we assume as true appellant's allegations that Paxson manufactures the "substantially same machine" as the one that caused his injuries.

**12.** Appellant relies on these cases to support his contention: *Giberson v. Ford Motor Co.,* 504 S.W.2d 8 (Mo.1974) (extending theory of products liability to bystander who was not purchaser or user of defective chattel); *King v. Moorehead,* 495 S.W.2d 65 (Mo.Ct.App.1973) (extending theory of implied warranties to residential leases); *Smith v. Old Warson Development Co.,* 479 S.W.2d 795 (Mo.1972) (extending theory of implied warranties to sale of new homes).

view, however, Missouri's commitment to strict liability does not provide a sufficient reason to depart from the traditional rule of nonliability in the instant case. The imposition of liability on an asset purchaser who neither made nor controlled the manufacture of a product raises different policy issues than those raised by the imposition of strict liability on a manufacturer or seller. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 441 n.8 (7th Cir. 1977). Indeed, the few courts which have considered Tucker's argument have reached different conclusions on whether the product line theory is consistent with the philosophy of strict liability. *Compare Domine v. Fulton Iron Works*, 76 Ill.App.3d 253, 32 Ill.Dec. 72, 395 N.E.2d 19 (1979), *and Barron v. Kane & Roach, Inc.*, 79 Ill.App.3d 44, 34 Ill.Dec. 569, 398 N.E.2d 244 (1979) (distinguishing *Ray* on its facts and disagreeing with its rationale), *with Ramirez v. Amsted Industries, Inc.*, *supra* (adopting the *Ray* analysis). Although Missouri may follow the trend of recent cases in extending the protection of strict liability to the innocent bystander,[13] the product line theory espoused by appellant is not well established and, therefore, the district court properly refused to apply that theory in this diversity case arising under Missouri law. *See Leannis v. Cincinnati, Inc.*, *supra*, 565 F.2d at 441 (refusing to adopt product line theory in Wisconsin) ("Federal court should not impose the policy pronouncements of the Supreme Court of one state upon the citizens of another."); *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir. 1977) (no indication that either Ohio or Indiana would follow *Ray*).

Furthermore, we doubt that Missouri would apply the *Ray* rule to Tucker's action against Paxson under the circumstances of this case. The *Ray* court imposed liability on Alad II because the considerations underlying strict liability outweighed the advantages of the general rule of nonliability "under the narrow circumstances here presented." *Ray v. Alad Corp.*, *supra*, 560 P.2d at 5. The court deemed the following considerations essential:

(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. [*Id.* at 9.]

The narrow circumstances present in *Ray* clearly differ from those present in this case. In *Ray*, the successor acquired the business from the original manufacturer and continued its operations without noticeable interruption. Here, Paxson acquired the Thropp assets from a bankrupt corporation that, in turn, had acquired the assets from a seller who had acquired them from Thropp in 1952. Unlike the successor in *Ray*, therefore, Paxson, as merely the latest link in a line of purchasers, does not possess the original manufacturer's ability "to estimate the risks of claims for injuries from defects in previously manufactured [machines]." *Id.* at 10. Under these circumstances, the burden of assuming responsibility for the 1918 Thropp machine would not necessarily attach to Paxson's enjoyment of Thropp's good will. Thus, the product line theory would appear to be inapplicable here.

### D. *Mere Continuation.*

Tucker also asserts that liability should be imposed on Paxson under the "mere continuation" exception to the general rule of nonliability. Tucker urges that Paxson is a "mere continuation" of Thropp because it benefits from Thropp's name and good will and produces substantially the same product as Thropp.

These factors, however, do not provide a sufficient basis to hold Paxson liable under this exception. The majority of courts considering this exception emphasize a common

---

**13.** *Giberson v. Ford Motor Co.*, 504 S.W.2d 8 (Mo.1974).

identity of officers, directors, and stock between the selling and purchasing corporations as the key element of a "continuation." *Leannais v. Cincinnati, Inc., supra,* 565 F.2d at 440; *Kloberdanz v. Joy Manufacturing Co.,* 288 F.Supp. 817, 821 (D.Colo. 1968). In *Brockmann,* for example, the Missouri Court of Appeals stressed that the incorporators of the successor also incorporated the predecessor and served as the directors, primary officers, and major stockholders of both corporations. *Brockmann v. O'Neill, supra,* 565 S.W.2d at 798.[14] Here, no stockholder of either Paxson or Mullins, Paxson's immediate predecessor, became an owner, director, or officer of the other. Further, no common identity of management or stockhold interest exists between the several corporations that have transferred the Thropp assets.

Accordingly, the lack of this key element in the transaction between Paxson and Mullins precludes the application of the mere continuation exception in this case.[15]

### E. *Duty to Warn.*

██ Finally, Tucker asserts that Paxson acquired an independent duty to warn Tucker's employer of the potentially dangerous condition of the Thropp machine. The crucial element necessary to establish a duty to warn is the "continuation of the relationship between the successor and the customers of the predecessor." *Gee v. Tenneco, Inc.,* 615 F.2d 857, 866 (9th Cir. 1980). The courts consider the following factors as significant in determining the existence of a relationship effective to create a duty to warn: (1) succession to a predecessor's service contracts; (2) coverage of the particu-

lar machine under the contract; (3) service of that machine by the purchaser-corporation; and (4) the purchaser-corporation's knowledge of defects and of the location or owner of that machine. *Travis v. Harris Corp., supra,* 565 F.2d at 449.

In this case, Tucker makes no allegation that Paxson inherited any of its predecessors' service contracts. On the contrary, Mullins specifically agreed to assume responsibility for the service of all warranty claims asserted by the customers of its former Lehmann/Thropp division. *Compare Shane v. Hobam, Inc., supra* (successor inherited service contracts that included responsibilities for servicing the allegedly defective product); *Wilson v. Fare Well Corp.,* 140 N.J.Super. 476, 356 A.2d 458 (Law Div. 1976) (same). Indeed, Paxson denies that it has ever inspected, serviced, or performed any work on the 1918 Thropp machine located at the Cupples plant. Tucker alleges, however, that Paxson's employees have serviced Mullins' equipment, including Thropp machines similar to the one that injured him. Tucker also alleges that Paxson knew of the defective nature of the 1918 Thropp rubber calendar machine.

We conclude that the factors alleged by Tucker do not provide a sufficient basis for imposing on Paxson a duty to warn Cupples of the allegedly defective condition of the Thropp machine. The Thropp machine in question was manufactured and sold to Cupples fifty-six years before Paxson acquired the Thropp assets. Moreover, Paxson did not directly purchase the assets from Thropp; rather, several corporations owned these assets before Paxson's acquisition. Further, Paxson never agreed to as-

---

**14.** The Missouri Court of Appeals also relied on the following factors to impose liability on a successor corporation under a "mere continuation" exception: (1) the business operations of both companies were identical; (2) the transferee used the same trucks, equipment, labor force, and supervisors as the transferor; and (3) the transferee assumed the transferor's contracts without notice to the contractors or the employees of the predecessor corporation. *Brockmann v. O'Neill, supra,* 565 S.W.2d at 798–99.

**15.** Tucker also urges this court to expand Missouri's theory of continuity of enterprise in product liability cases by allowing recovery against purchasers of corporate assets even if identity of ownership and management is lacking. *See Cyr v. B. Offen & Co., Inc., supra; Trimper v. Bruno-Sherman Corp.,* 436 F.Supp. 349 (E.D.Mich.1977); *Turner v. Bituminous Casualty Co., supra.* For the reasons set forth in our discussion of the product line theory of liability, we decline to expand the theory of continuation beyond that recognized by the Missouri courts in *Brockmann.*

sume responsibility for the servicing of the Thropp machines. Under these circumstances, the bare assertion that Paxson knew of the defective nature of the 1918 rubber calendar machine and of its location at the Cupples plant does not show the necessary "relationship between the successor [Paxson] and the customers [Cupples] of the predecessor [Thropp]."[16] *Gee v. Tenneco, Inc., supra*, 615 F.2d at 866.

### III. *Conclusion.*

We conclude that the district court correctly determined that Paxson did not become liable under Missouri law for the allegedly defective machine manufactured by its predecessor under the facts and circumstances in this case.

Affirmed.

---

**16.** Although Paxson may have benefited to some extent from the good will of Thropp, we likewise do not consider this factor sufficient to create a duty to warn under the circumstances of this case. *See Travis v. Harris Corp., supra*, 565 F.2d at 448.