**Orval L. REED, Plaintiff,**

v.

**ARMSTRONG CORK CO., et al., Defendants.**

**No. LR–C–79–477.**

United States District Court, E.D. Arkansas, W.D.

Oct. 28, 1983.

---

Edward O. Moody, Little Rock, Ark., Robert Sweeney, Dorrit Purdy, Sweeney, Mahon & Vlad, Cleveland, Ohio, for plaintiff.

Boyce R. Love, Gail O. Matthews, Little Rock, Ark., Otis H. Turner, Arkadelphia, Ark., Robert L. Henry, III, Little Rock, Ark., Dennis L. Shackleford, El Dorado, Ark., Hayes C. McClerkin, Texarkana, Ark., Phillip Carroll, Little Rock, Ark., Howard Waldrop, George L. Williams, Texarkana, Tex., Alvin Laser, Little Rock, Ark., Stephen A. Matthews, Pine Bluff, Ark., Floyd M. Thomas, Jr., El Dorado, Ark., R. Eugene Bailey, Little Rock, Ark., Otto Ritter, Longview, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Pending before this Court are plaintiff's motions for partial summary judgment against Pittsburg Corning Corporation (PCC) and Nicolet, Inc. Plaintiff asks this Court to decide as a matter of law that PCC is the successor corporation of UNARCO, that Nicolet is the successor corporation of Keasbey & Mattison (K & M), and that as successor corporations, PCC and Nicolet are liable for any damages caused to plaintiff by his exposure to the various asbestos-containing products of their predecessors, UNARCO and K & M. Both PCC and Nicolet oppose the motions and Nicolet has counter-moved for summary judgment on the issue of whether it is liable for K & M's actions. Plaintiff has not responded to Nicolet's motion.

The traditional corporate rule of nonliability is that where one company sells or transfers all its assets to another company, the latter company is not liable for the debts and liabilities of the transferor. However, the traditional exceptions to this rule are:

1. Where the transferee assumes the debts and obligations of the transferor by express or implied agreement;

2. Where there is a consolidation or merger of the two corporations;

3. Where the transaction is fraudulent or lacking in good faith; and,

4. Where the purchasing corporation is a mere continuation of the selling corporation.

Since the application of the traditional approach sometimes frustrated the expanding theory of strict liability in products liability cases, several courts have adopted the product line exception in products liability cases to offset the potentially harsh impact of the rule. Generally the product line exception is that where one corporation acquires all or substantially all of the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

The parties all agree that Arkansas courts have not addressed the product line exception. However, plaintiff contends that since PCC and Nicolet are Pennsylvania corporations, Arkansas, in applying choice of law, would find that the question of whether the corporations were successor corporations would be governed by Pennsylvania law since the sales agreements provided that Pennsylvania law would govern the rights of the corporations and matters of corporate organization are controlled by the state of incorporation. Defendants argue that since the issue is whether they should be held liable in strict liability, the question of liability is tort rather than contract law and so the law of the situs where the injury occurred and plaintiff resides would control.

■ The Court agrees with defendants that the question of liability is created under strict liability theory which is tort rather than contract or corporate law. Thus, Arkansas rather than Pennsylvania law would apply. As stated before, Arkansas courts have not dealt with the product line

exception. This Court, therefore, must determine or predict what the Arkansas law is. A review of the cases cited in the parties' briefs demonstrates that the Arkansas courts have followed the traditional approach on successor corporations. There is no indication that Arkansas courts would abandon the traditional rationale and this Court predicts that if faced with the issue, Arkansas courts would join the clear majority of other courts that have addressed the issue in retaining the traditional approach, especially under the facts presented here.

A review of the facts presented in the motions for summary judgment follows:

1. On July 25, 1983, plaintiff filed his motion for partial summary judgment against PCC on the basis that the issue of PCC as a successor corporation had already been decided in *Amader v. Pittsburg Corning Corp.*, 546 F.Supp. 1033 (E.D.Penn.1982).

2. On August 26, 1983, PCC responded that *Amader* only decided whether evidence of successor liability could be presented to the jury. PCC denied it was a successor to UNARCO. In support of its response, PCC attached an affidavit by Robert E. Buckley, a consultant and former officer and employee of PCC, and a copy of the sales agreement between PCC and UNARCO. The affidavit was prepared from his knowledge during his positions as Vice President of Sales nationwide from 1959 to 1968, Vice President-International Sales from 1968 to 1974, and Assistant to the President from 1974 to 1980. He stated that on July 1, 1962, PCC purchased from UNARCO for $750,000.00 cash a manufacturing plant, equipment, and the technology relating to a rigid asbestos-containing thermal insulation product, Unibestos; that the contract provided that PCC would have access to UNARCO's Unibestos customer lists, which customers were for the most part already PCC customers; that the contract also provided that UNARCO would indemnify PCC for any liability arising out of UNARCO's manufacture and sale of Unibestos; that the

contract did not obligate PCC to hire or continue the employment of any of UNARCO's employees; that the contract did not contain any provision for goodwill; that PCC did not obtain the "UNARCO" trade name; that PCC sold Unibestos in noticeably different containers with PCC's name and logo which was different in design and color; that all advertising and sales material disclosed that Unibestos was being made and supplied by PCC; that PCC and UNARCO never shared any officers or directors; that PCC never owned stock in UNARCO; that UNARCO has never owned any stock in PCC; and that PCC has always been a substantially smaller corporation than UNARCO in terms of assets, sales and net worth. Attached to the affidavit were the sales agreement and copies of the advertising and sales materials which show the difference in packaging and advertising.

3. On September 8, 1983, plaintiff replied that Buckley's affidavit is hearsay and not relevant and should be disregarded. The remainder of the reply is argument as to the relevant case law. Attached to the reply was a copy of *Amader.*

4. On September 26, 1983, plaintiff filed a motion for partial summary judgment against Nicolet on the basis that the issue of Nicolet as a successor corporation had already been decided in *Davis v. Johns-Manville Sales Corp.,* 80–041153–NP (Mich.Cir. Order of July 21, 1982) and *In Re: Asbestosis Cases,* (CP Greenville, S.C. Order of June 10, 1977). Plaintiff relies on the terms of the sales agreement between Nicolet and K & M whereby he asserts Nicolet agreed to purchase the Industrial Products Division buildings, fixtures, machinery and equipment; records and equipment related to K & M's Industrial Products business; K & M Industrial Products Division raw materials, work in progress, and finished good inventories. Plaintiff further contends that K & M agreed to assign to Nicolet contracts, agreements, orders and obligations to be carried out

by Nicolet without interruption; that Nicolet hired most of the sales force and salaried staff of K & M's Industrial Products Division; that Nicolet utilized the K & M name on the asbestos-containing insulation products which it produced using the K & M facilities; and that although Nicolet did not condition the sale upon dissolution, K & M recited in the agreement an intention to dissolve which it did so in 1967 after ceasing to do business after 1962. Plaintiff notes that K & M sold its remaining assets as follows: Asbestos Pipe Division to Certain-Teed Products, the Roofing Division to Bird & Sons, Inc. and the Asbestos Textile Division to Asbestos Textile Corporation. Attached to the reply were copies of Nicolet's sales, promotional and advertising materials which show K & M products. Also attached were copies of cases on the product line exception.

5. On October 6, 1983, Nicolet responded to plaintiff's motion and filed a counter-motion. Nicolet denied that it was a successor to K & M. In support of its response and counter-motion, Nicolet attached an affidavit by Guy G. Gabrielson gave in a Florida case, copies of the sales agreement, bill of sale, assignment of patents, tradenames, trademarks, and certain contracts and obligations, and resolutions and certificates on the dissolution of K & M. Gabrielson's affidavit states that in the 1930's Turner and Newall (T & N) in the United Kingdom acquired all the outstanding shares of K & M and remained the sole shareholder until K & M dissolved in 1967. Apparently, as a result of an antitrust investigation, T & N negotiated a sale of the assets of Asbestos Cement Pipe Division of K & M, the largest division, to Certain-Teed Products Corporation in the winter of 1961–62 or spring of 1962 in exchange for shares of the latter. Having sold the major share of the assets of K & M, on April 13, 1962, T & N adopted a resolution of dissolution. In mid-May of 1962, Gabrielson, upon hearing of the decision to liquidate K & M, contacted K

& M Vice President George Barge and was told that the five plants and other assets of Asbestos Cement Pipe Division had been, or would be, sold to Certain-Teed Products; the assets of the Asbestos Textile Division had been, or would be, sold to American Asbestos Textile Corporation; and the operations at the Building Materials Division in Ambler, Pennsylvania, had been discontinued some months earlier, some of its machinery and equipment had already been sold and removed from the plant, and the title to the land and buildings would shortly be subject to sale. Barge advised that if Nicolet wished to purchase the remaining assets related to the manufacture of industrial products, T & N should be contacted directly. After Gabrielson toured the facility, he made an offer to Barge for transmittal to T & N for certain land, buildings, machinery, equipment inventories, supplies, patents, trademarks and pertinent records of K & M Industrial Products Division. On September 28, 1962, Nicolet purchased only a portion of the assets of K & M Industrial Products Division; it did not purchase the substantial K & M assets located in other parts of the country; it did not purchase in Ambler the head office building, the building products plant, the office building/auditorium, the research and development building or the pipe plant; it only purchased sales, accounting, production, research and engineering files, records, drawings and data, research and pilot plant equipment, raw materials, supplies, work in progress and salable finished goods as related to the business to be conducted with the machinery acquired; and K & M assigned various patents, tradenames and trademarks which would only be useful in the assets acquired.

Gabrielson states that the assets purchased by Nicolet were producing less than 20% of the total revenues of K & M and less than 5% of the total profits; that Nicolet hired less than 25% of K & M's former employees while other companies hired 70%; that the assets were purchased for $1,145,000.00 consisting of cash, a note and mortgages; that Nicolet did not purchase or assume the general or product liability insurance policies of K & M; that K & M retained all liabilities not specifically assumed by Nicolet including the obligation to fund accrued retirement benefits of those K & M employees who later were employed by Nicolet; that K & M consented to the use of Nicolet of the name "Keasbey & Mattison Company", subject to a similar right by Certain-Teed; that within a few months after purchase, Nicolet concluded that the Keasbey & Mattison name did not enjoy a favorable reputation and so the use of the trade style was gradually phased out; that on December 26, 1963, for economic reasons, Nicolet sold its inventory and materials to Baldwin-Ehret-Hill, Incorporated; that K & M filed a Certificate of Election to Dissolve with the Corporation Bureau of the Department of State of the Commonwealth of Pennsylvania, but continued in existence until March 10, 1967, when a Certificate of Dissolution was issued; and that T & N continues in existence.

6. Nicolet also attached copies of the opinions in *Broome v. Accurate Felt & Gasket Manufacturing Co.*, Civ–1–81–432 (E.D.Tenn. July 23, 1982); *Osteen v. Combustion Engineering, Inc.*, CV 79–0–47 (D.Neb. September 24, 1981); *Di Gravina v. Johns-Manville*, L–6001–79 (Superior Court of N.J. October 14, 1981); *Carpenter v. Combustion Engineering*, C78–224 (N.D.Ohio March 15, 1979); *Hendrix v. Celotex Corp.*, CV479–327 (S.D.Ga. April 28, 1981); and a compilation of twenty cases from the Eastern District of Texas. All those cases held that Nicolet would not be held liable as the successor corporation of K & M.

As can be seen from the above summaries of the pleadings, both PCC and Nicolet have submitted affidavits in accordance with the provisions of Rule 56 in support of their positions that they are not successor corporations. Plaintiff instead has relied on holdings in other cases, argument by

plaintiff's counsel, and only several exhibits that are rather ambiguous. Plaintiff has not submitted any controverting affidavits to the facts asserted in defendants' affidavits.

■ It is clear from the uncontroverted facts contained in the affidavits that neither PCC nor Nicolet are successor corporations when the traditional exceptions are applied. Neither PCC nor Nicolet assumed the debts and obligations of the selling company by express or implied agreement. Although each contract contained an indemnification agreement, these only support the view that there was no assumption of liability. There was no merger, consolidation or mere continuation of the selling companies. In each instance, the buying corporation purchased only one portion of the selling company. PCC purchased a portion of a larger company that is still in operation. Nicolet purchased only one of the four portions that K & M sold and its portion accounted for less than 20% of the total revenues. In each case there was no intermingling of directors or officers and no shared stock. Furthermore, plaintiff has not even alleged that the transactions were fraudulent or lacking in good faith.

■ However, even if Arkansas adopted the product line exception or even if this Court were to find that Pennsylvania's product line exception should be applied, this Court would still find that PCC and Nicolet are not successor corporations. As demonstrated by the defendants' affidavits, neither PCC nor Nicolet acquired all or substantially all of the manufacturing assets of the selling company. In both cases, the officers, directors, and a substantial majority of the workforce changed with the sale. As stated before, defendants have supported their positions with documentary evidence including affidavits and deposition while plaintiff has mainly relied on argument and case law. It is interesting to note that several times the Court of Common Pleas for Philadelphia County, Pennsylvania, has constructed Pennsylvania law to foreclose corporate successor liability against PCC. In the opinion filed on February 9, 1983, in *Pizzio v. Johns-Manville Corp.*, No. 2676, Judge Takiff agreed with *Amader's* anticipation that the Pennsylvania Supreme Court would adopt the product line exception, but disagreed with its application against PCC under the circumstances especially when UNARCO was also a named defendant. If this Court were to rely merely on case law as plaintiff has done, it is apparent that the majority of cases including cases addressing Pennsylvania's product line exception have found in favor of PCC and Nicolet on the issue of successor corporation liability.

In summary, this Court finds that Arkansas law is applicable in determining whether liability in tort under product liability theory would be imposed as a matter of law against PCC and Nicolet as successor corporations. Under the traditional test in Arkansas, neither PCC nor Nicolet can be considered as successor corporations as a matter of law. Even if this Court predicted that the product line exception would be adopted in Arkansas or even if this Court determined that Pennsylvania law and its product line exception would apply, neither PCC nor Nicolet could be considered as a matter of law under the facts presented to be successor corporations under the product line exception.

Accordingly, the Court finds that plaintiff's motion for partial summary judgment against PCC and plaintiff's motion for partial summary judgment against Nicolet on the issue of successor corporate liability should be, and they are hereby, denied. Nicolet's counter-motion for partial summary judgment on the issue of successor corporate liability is hereby granted.