**Peggy J. SWAYZE, Administratrix of the Estate of Gilbert "Buck" Alexander Swayze, Plaintiff,**

**v.**

**A.O. SMITH CORPORATION, et al., Defendants.**

**No. LR–C–87–649.**

United States District Court, E.D. Arkansas, W.D.

Aug. 30, 1988.

Comer Boyett, Jr., Searcy, Ark., Morgan E. Welch, North Little Rock, Ark., for plaintiff.

Nate Coulter, and Roger Glasgow, Wright, Lindsey & Jennings, Robert Walsh, Friday Firm, H. William Allen, Little Rock, Ark., for intervenor.

Michael E. Hale, and Austin McCaskill, Sr., Barber, McCaskill, Amsler, Jones & Hale, Jim Tilley, Huckaby, Munson, Rowlett & Tilley, Little Rock, Ark., for defendants.

## ORDER

GEORGE HOWARD, Jr., District Judge.

On March 26, 1987, Gilbert A. "Buck" Swayze was killed in an industrial accident at Smith Fiberglass while operating a "stripper machine." Decedent's estate filed suit against a number of corporations, including Ameco, the alleged corporate successor to the original manufacturer of the machine. The complaint alleges implied warranty, negligence, and products liability.

Ameco has filed a motion to dismiss, contending that as a successor corporation, it is not liable to plaintiff for any damages. Both plaintiff and Ameco have submitted numerous documents and responses in support of their positions. By order dated August 18, 1988, the Court advised the parties that it would treat the motion to dismiss as a motion for summary judgment and directed the parties to submit statements of material facts pursuant to Local Rule 29. On August 26, 1988, the Court conducted oral argument on the motion to dismiss. For the reasons stated below, the motion is granted.

## FACTS

Plaintiff's decedent, an employee of Smith Fiberglass Products, Inc., in Little Rock, Arkansas, was killed in an industrial accident on March 26, 1987. The accident involved a "stripper machine" which plaintiff alleges was, in part, planned, designed, manufactured, assembled, sold, distributed and installed by Ameco Corporation or its predecessor in title and interest.

The undisputed facts reveal that the machine in question was built in 1963 by Automation Machine & Equipment Co., Inc.

("A.M. & E") expressly for A.O. Smith Corporation. A.M. & E was incorporated in the State of Wisconsin in 1953. It manufactured items pursuant to special orders and had no specific product line.

The stripper machine was installed at the Dow–Smith plant in Little Rock, Arkansas as part of an overall operation known as a Six Head Winding Line. After the installation of the machine and dubbing of the Six Head Winding Line in 1964, A.M. & E and Dow–Smith or A.O. Smith had no further contact regarding the machine. The Six Head Winding Line, including the stripper, was a one-of-a kind special order machine which was never duplicated.

In 1968, A.M. & E was voluntarily placed in receivership in the Milwaukee County Circuit court pursuant to the Wisconsin Assignment for Benefit of Creditors Act. On April 22, 1968, Ro–Band Corporation, a Wisconsin corporation, purchased the physical assets of A.M. & E from the company's receiver pursuant to an order of the Milwaukee County Circuit Court. The bill of sale provided that Ro–Band acquire right, title and interest in all physical assets of A.M. & E except accounts receivable, life insurance and tax refunds or claims, free and clear of all liens and encumbrances. The sale was ratified, approved and confirmed by the Milwaukee County Circuit Court.

Ameco contends that Ro–Band had no connection with A.M. & E. According to the affidavit of Gerald J. Achtor, the president of Ro–Band Corporation, Ro–Band retained about twenty percent of A.M. & E's work force and installed new management. Achtor also asserts that Ro–Band assumed no liabilities and paid off no creditors of A.M. & E. Its shareholders and directors were totally distinct from A.M. & E.

Subsequent to its receivership, A.M. & E took no action to dissolve the corporation and was placed in bad standing by the Wisconsin Secretary of State on January 1, 1969 for inactivity due to the discontinuance of business. Although in bad standing, A.M. & E continued as a body corporate, duly and legally incorporated, and existing under the laws of Wisconsin, until a Certificate of Involuntary Dissolution was issued on January 18, 1979, pursuant to section 180.769(3) of the Wisconsin Statutes.

After purchasing the physical assets of A.M. & E, Ro–Band assumed the lease for the building which formerly housed A.M. & E and established the "Ameco Division". This division manufactured items pursuant to special order. The Ameco Division continued to operate until September, 1975, at which time the assets of the Ameco Division were sold to John H. Kopmeier, Jr., and Heinz H. Schmeisser, who had no prior association with either Ro–Band or A.M. & E. The purchase was of tangible and intangible assets and included the sale of machinery, equipment, tools, fixtures, books, records, papers, documents, engineering drawings, designs and data, trademarks, trade names, copyrights, and patents. The agreement of sale entered into on September 30, 1975, contained the following provision:

> Buyer is not assuming any obligations or liabilities of Seller of any kind whatsoever, including specifically, but not limited to, any obligations of Seller for product warranty claims, taxes ..., any obligations to customers or suppliers of Seller, and any obligations of Seller to employees of Seller for services rendered prior to October 1, 1975, including any obligations of Seller in connection with employee fringe benefit programs.

Paragraph 7d of Agreement of Sale.

As a result of the sale, the Ameco Division of Ro–Band was closed, but Ro–Band continued in operation. Kopmeier and Schmeisser incorporated the business under the name of Ameco Corporation. Five employees of the Ameco Division were transferred to Ameco, however the Agreement of Sale specifically provided that none of the provisions of the employee fringe benefit programs would survive the sale. Pursuant to the terms of the Agreement of Sale, Ro–Band subleased the building previously occupied by its Ameco Division to Ameco.

The Agreement of Sale contained a provision that any unfinished contracts for ma-

chine manufacturing held by Ro–Band shall remain the property of Ro–Band, however, Ro–Band agreed to subcontract to Ameco the work required by the contracts. The Agreement also contained a covenant not to compete.

Ameco is also a special order manufacturer and has not designed or manufactured any product identical to any product designed or manufactured by A.M. & E. Ameco has not serviced or inspected the stripper machine and had not had any contact concerning the stripper machine until the day after Mr. Swayze's accident when a representative of Smith Fiberglass Products contacted Ameco and requested records of the machine.

During the almost eight years that Ro–Band operated the Ameco Division, it did not employ either the logo of A.M. & E or a separate Ameco logo. Rather, it used the existing Ro–Band corporate logo. After the sale of the Ameco Division and the establishment of the new Ameco Corporation, Ameco began using the same logo used by A.M. & E.

In 1983, all outstanding shares of Ameco were acquired by Manca, Inc.

### ANALYSIS

The general rule in the majority of jurisdictions is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. However, the rule is subject to the following exceptions: (1) where the transferee assumes the debts and obligations of the transferor by express or implied agreement; (2) where there is a consolidation or merger of the two corporations; (3) where the transaction is fraudulent or lacking in good faith; and (4) where the purchasing corporation is a mere continuation of the selling corporation. *Reed v. Armstrong Cork Co.*, 577 F.Supp. 246, 247–8 (E.D.Ark.1983). The general rule and its exceptions have long been a part of Arkansas law. *Good v. Ferguson & Wheeler Land, Lumber & Handle Co.*, 107 Ark. 118 (1913). *See also Reed v. Armstrong Cork Co.*, *supra*, where this Court found that Arkansas

courts would not abandon the traditional rule of liability in favor of a "product line" exception.

Plaintiff advances a number of theories to support her contention that Ameco should be liable as a successor corporation. Plaintiff first attempts to rely on two traditional exceptions, i.e., that Ameco is liable under the first exception in that through each sale of A.M. & E, the purchasers either expressly or impliedly agreed to assume the liabilities of their predecessor, and that Ameco is liable under the fourth exception in that Ameco is a mere continuation of A.M. & E.

■ Plaintiff's first argument, that of express or implied assumption, is easily disposed of. A review of the submissions reveal that Ro–Band, for $50,000.00, purchased the physical assets of A.M. & E. There is no indication that Ro–Band intended to assume the liabilities; in fact, the evidence submitted points to the opposite conclusion. Furthermore, Ameco expressly excluded the assumption of liability in the sales contract. The Court cannot, in the face of the unambiguous language of the contract, find that Ameco intended to assume the liabilities of the predecessor corporations.

■ In support of her argument that Ameco is a mere continuation of A.M. & E, plaintiff points to a number of facts including the following: (1) Ro–Band retained twenty percent of the original work force; (2) Ro–Band, in its order to purchase, reserved the right to have A.O. Smith purchase a used separation and feeding machine; (3) Ameco had the blueprints for the 1963 stripper machine; (4) Ameco uses substantially the same logo as A.M. & E; (5) Ro–Band assigned to Ameco an exclusive sales agency agreement with Harris Industrial Sales, a company owned by the former president of A.M. & E; (6) Ameco possesses A.M. & E's documents and records; and (7) Ameco is in the same location as its predecessor.

The majority of courts considering the "mere continuation" exception emphasize a common identity of officers, directors, and

stock between the selling and purchasing corporations. *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 625–6 (8th Cir.1981). *See also U.S. v. Vertac Chemical Corp.*, 671 F.Supp. 595, 614 (E.D.Ark.1987). Here, there is no evidence of an intermingling of directors and officers and no shared stock. Furthermore, there is no indication that the employees retained by Ro–Band were in managerial positions. Although plaintiff argues that the president of A.M. & E continued in some capacity with Ro–Band, the uncontroverted affidavit of Ro–Band's president establishes that Harris was a commissioned sales representative for Ro–Band, and not in any managerial position.

In sum, the Court, after reviewing the record, finds that Ameco is not a mere continuation of A.M. & E under the exception to the traditional rule.

■ Plaintiff also urges this Court to adopt the continuity of enterprise theory enunciated in *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), wherein the Michigan Supreme Court stated that in a products liability case, a successor corporation can be liable where: (1) there is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations; (2) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. 244 N.W.2d at 879.

Plaintiff also argues that Ameco should be estopped from denying successor liability in that it has held itself out to the public as either the same company as A.M. & E or as a continuation of A.M. & E. The estoppel argument has been considered by some courts in conjunction with the continuity of enterprise theory. *See Salvati v. Blaw–Knox Food & Chemical Equipment, Inc.*, 497 N.Y.S.2d 242, 130 Misc.2d 626 (Sup. 1985); *Matrix–Churchill v. Springsteen*, 461 So.2d 782 (Ala.1984).

The Court is of the opinion that the Arkansas courts would not expand the theory of continuity of enterprise beyond the traditional exceptions recognized by the majority of jurisdictions.[1] *See Tucker*, 645 F.2d at 626, n. 15; *Reed*, 577 F.Supp. at 248. *See also Polius v. Clark Equipment Co.*, 802 F.2d 75 (3rd Cir.1986).

■ However, even assuming Arkansas adopted the more liberal view of continuity of enterprise, the Court is persuaded that under the facts of this case, plaintiff has failed to demonstrate that Ameco is a continuation of A.M. & E.

Plaintiff makes much of the similarity of the logo used by A.M. & E and Ameco. However, this alone, does not establish continuity of enterprise. Even the use of the same physical location is not enough to find that Ameco held itself out as the same company. The Court notes that in the cases cited by plaintiff additional factors existed which bolstered the plaintiff's argument of continuity of enterprise, particularly the manufacture and promotion of the same or similar product, retention or use of managerial personnel, and assumption of some liabilities, including continuation of employee benefits. *See generally, Ede v.*

1. While the Court is of the opinion that the continuity of enterprise theory may be the better approach to dealing with successor liability in products liability cases, the Court is aware that its task is to determine or predict what the Arkansas law is. In that respect, the Court finds the following from Chief Judge Reynolds, of the Eastern District of Wisconsin, particularly relevant to the instant case:

"Plaintiff's counsel argues eloquently and, to me, convincingly that as a matter of social policy, the right of a person injured by a defective product to recover from the manufacturing company should not turn on the subsequent history of that company, especially when the company, though under new ownership, is still extant in the eyes of the public and is still enjoying the benefits of its name and its good will. This argument, however, is directed to the wrong forum. My function is to follow the rule which the Wisconsin Supreme Court would probably follow."

*Bazan v. Kux Machine Co.*, 358 F.Supp. 1250, 1251 (E.D.Wis.1973).

**624**

Mueller Pump Co., 652 F.Supp. 656 (D.Colo.1987); *Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136 (E.D.Mich. 1979); *Matrix–Churchill v. Springsteen, supra; Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781 (Ala.1979).

The Court is persuaded that, even assuming Arkansas were to adopt the "continuity of enterprise" theory, there are not sufficient factors to establish that Ameco is liable under that theory or that Ameco is estopped from denying that it is liable.

Plaintiff also appears to argue that Ameco is liable under the "product line" exception. As noted above, this Court has already determined that Arkansas would not adopt the "product line" exception. *Reed v. Armstrong Cork Co., supra.* Furthermore, the Court is not persuaded that such an exception is applicable where a company manufactures special order machinery and does not have a specific product line.

Plaintiff contends that the issue of whether Ameco is a successor corporation is a question of fact which should be left to the jury. In a motion for summary judgment, the Court must determine whether, after considering all the evidence, there is a genuine issue of material fact. While there may be some issues of fact in dispute, the Court finds that the material facts concerning Ameco's liability as a successor corporation are not in dispute, and that as a matter of law, Ameco is entitled to judgment.

Accordingly, Ameco's motion to dismiss is granted. Ameco's motions to stay proceedings, for leave to file third party complaints, for a pretrial conference, and for a continuance are moot as Ameco is no longer a party to these proceedings. The Court reminds the remaining parties that the trial in this matter is scheduled to begin Monday, September 19, 1988.